Theodore Bruce **MATTHEWS**, Appellant,

v.

**DISTRICT OF COLUMBIA**, Appellee.

No. 11476.

District of Columbia Court of Appeals.

Argued March 9, 1978.

Decided May 31, 1978.

---

Douglas J. Adams, Silver Spring, Md., with whom Steven M. Cooper, Silver Spring, Md., was on the brief, for appellant.

David P. Sutton, Asst. Corp. Counsel, Washington, D. C., with whom John R. Risher, Jr., Corp. Counsel, Louis P. Robbins, Principal Deputy Corp. Counsel, Richard W. Barton, Deputy Corp. Counsel, and Margaret L. Hines, Asst. Corp. Counsel, Washington, D. C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, and KERN and GALLAGHER, Associate Judges.

NEWMAN, Chief Judge:

Appellant, an inmate of Lorton Reformatory, sued the District of Columbia for damages based on alleged negligence in inmate supervision and general prison security which rendered appellant vulnerable to knife attack by unidentified fellow inmates. The jury returned a verdict for appellant and awarded $15,000 in damages. The trial court subsequently granted appellee's motion for judgment n. o. v., and this appeal followed. Appellant contends on appeal that the trial court erred in finding: (1) that appellant failed to establish a sufficient factual basis for a jury to find negligence, and (2) that appellant failed to prove that the incident complained of would not have occurred "but for" appellee's negligence. We conclude that appellant failed to establish any negligence on appellee's part (and thus need not reach the proximate causation issue). We affirm.

The facts are undisputed. Appellant was housed at Lorton in one of six dormitories located on the "north walk." The assault upon him occurred at about 8:25 p. m. on September 3, 1973. At the time of the incident, a movie, attended by most of the inmates, was being shown in the gymnasium. Appellant, who had remained behind in his dormitory to study, testified that he was standing by his bed when he was suddenly grabbed from behind by several unidentified inmates. He struggled and called out for assistance for several minutes be-

fore suffering severe knife wounds to the lower back.

Prior to the infliction of appellant's injuries, Lorton officials had calculated and determined that at least 51 guards were necessary to provide adequate security during the relevant watch. This level of manpower, denominated the "critical minimum" number of guards required, corresponded to the 51 specific position points established as guard posts. A post in front of each of the six dormitories on the north walk was included in this group of key security vantage points. The only way for a guard to see inside a dormitory was to stand at the front door of the dormitory which contains a floor-to-ceiling window. As a regular practice, guards were reassigned from one of these 51 posts to other assignments, which were not included in the critical minimum, as required by prisoner population movement and manpower needs.

At the time of the attack on appellant, the north walk in front of the six dormitories was being patrolled by two unarmed guards. One guard, noting "a commotion," looked in and signalled with a flashlight to the second guard, who was at the other end of the walk. They apparently awaited reinforcements and did not enter the dormitory until after the assailants had left it. They were unable to identify the attackers because of poor visibility resultant from darkness and dim lights. Inmates were free to come and go to participate in various activities until 10:30 p. m., but it was against regulations for inmates from one dormitory to enter another.

There was no direct evidence, by expert testimony or otherwise, that the practice of reassigning guards from the respective "critical minimum" posts, at such times as the bulk of the inmate population was concentrated in one location, was contrary to sound correctional practices or that the basic design of the security plan itself was flawed.

I

■ Before reaching the question of appellee's negligence, we must discuss a threshold question raised by appellee. Appellee urges upon us the resolution of an issue of first impression in this jurisdiction—what standard of care shall be required of the District of Columbia in the performance of its duties as custodian of the city's prisoners. Appellee informs us that this issue is a recurring one in this jurisdiction and urges us to resolve it in this case.

Appellee contends that the inherent nature of the prison environment evokes the need for a special standard of care—one referred to as "the prior notice rule." This rule requires that authorities, alerted by some antecedent danger signal, usually stemming from the known violent or dangerous nature of the assailant or known threats to the victim, fail to take adequate precautionary measures despite such notice in order to be held liable for negligence. Although the government cites us to cases discussing this rule, e. g., *Parker v. State*, 282 So.2d 483 (La.), *cert. denied*, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973); *Harris v. State*, 61 N.J. 585, 297 A.2d 561 (1972); *City of Lexington v. Greenhow*, 451 S.W.2d 424 (Ky.1970); *see also* Annot., 41 A.L.R.3d 1021 (1972), a close and careful reading of those authorities indicates that while making reference to the prior notice rule, the *holding* in each of those cases is consistent with the application of ordinary negligence standards. For example, in *Parker v. State, supra*, a case involving a stabbing, the record indicates regular and frequent searches for weapons and specific counselling by the correctional authorities of the two inmates involved concerning their homosexual relationship. The court rejected plaintiff's contention that there was a statutorily created absolute liability and rather analyzed his contentions on a negligence rationale. Further, in *Harris v. State, supra*, an action against correctional officials individually (the state had not waived sovereign immunity), the court held that there was no showing that ordinary negligence on the part of prison officials had permitted the bludgeoning of the victim by a fellow inmate. 297 A.2d at 565.

And in *Lexington v. Greenhow, supra,* the court specifically reaffirmed its prior holding in *Ratliff v. Stanley,* 224 Ky. 819, 7 S.W.2d 230 (1928), which stated: "the duty imposed upon a jailer [is] the duty to exercise reasonable and ordinary care and diligence to prevent unlawful injury to a prisoner placed in his custody. But he cannot be charged with negligence in failing to prevent what he could not reasonably anticipate." *Lexington v. Greenhow, supra* at 425.

This court, in determining what duty of care is owed by a common-carrier to its passenger, has had occasion to evaluate the continuing validity of special standards of care. In *D.C. Transit System, Inc. v. Carney,* D.C.App., 254 A.2d 402 (1969), we expressly rejected the doctrine of differential duties of care dependent upon the characterization of the relationship between the parties. As we said in that case: "there are no categories of care, i. e., the care required is always reasonable care." *Id.* at 403.

The generally recognized common law duty owed to prisoners by penal authorities is one of reasonable care in their protection and safekeeping. *Gaither v. District of Columbia,* D.C.App., 333 A.2d 57 (1975) (and cases cited therein at 60). *See* Restatement (Second) of Torts § 320 (1965). Similarly, 18 U.S.C. § 4042 (1969) has been held to establish a duty of ordinary diligence as the standard of care to which the U.S. Bureau of Prisons must adhere in safeguarding federal prisoners. *Jones v. United States,* 534 F.2d 53 (5th Cir.), *cert. denied,* 429 U.S. 978, 97 S.Ct. 487, 50 L.Ed.2d 586 (1976).[1] While we agree that a party cannot be held liable in a negligence action for events which are *not* foreseeable by the exercise of reasonable diligence, we see no reason to adopt special standards of care applicable to jails or correctional institutions. Thus, we reject the so-called "prior notice" rule and adopt an ordinary negligence standard requiring the exercise of reasonable care by the District of Columbia government, and its

agents and employees, in the protection and safekeeping of prisoners. While the government is not an insurer of the safety of a prisoner, it is only proper that the responsible entity or person be held liable where damage proximately results from a failure to exercise reasonable care to prevent harm.

## II

We turn now to the facts of this case.

■ Appellant contends that the trial court erred in overruling the jury's finding of negligence against the District of Columbia. He argues that several factors form a sufficient factual basis from which the jury could make a finding of negligence. First, he alleges that the presence of a guard on duty at the dormitory front door, in a position from which he could see and hear activities within the dormitory and prevent entry by unauthorized inmates, would have had a deterrent effect in this case. Second, appellant claims that the dimmed lights facilitated the surreptitious commission of violent acts. Finally, appellant maintains that the rule prohibiting entry by an inmate into a dormitory not his own demonstrates that prison officials had notice of the need to exercise care to prevent such entries. Appellant urges us to presume that correctional officers must be able to see and hear inmates in order to exercise due care in their safekeeping. We note, however, that there was no expert testimony on the adequacy of the Lorton security arrangements *nor other showing* that it was unreasonable to allow flexibility in placement of correctional officers in accordance with inmate population movements.

Appellant further contends that the jury is fully capable of discerning any deviation from a proper standard of care in a given set of circumstances as it did in *Gaither v. District of Columbia, supra. Gaither,* however, presents a situation that is clearly distinguishable from that in the present case. There the negligence arose from

1. Breach of this duty is actionable under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) (1976), 2671 2680 (1965). *United States v.*

*Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963).

events within the realm of common knowledge and everyday experience; *i. e.*, a reasonable and prudent man knows the danger from ordering someone to light a burner from which gas may be escaping. No expertise was deemed necessary to ascertain that such an act could result in an explosion or high degree of risk. It is *not* a comparable issue to that of whether a prison's security system is planned or operated within the bounds of ordinary and reasonable care.[2]

In reviewing the trial court's grant of judgment n. o. v., we must balance the evidence that weighs against the trial court's determination and in favor of the jury's. *Baker v. D.C. Transit System*, D.C. App., 248 A.2d 829 (1969). We conclude, as did the trial court, that appellant having failed to establish the breach of any duty owed him, there was no evidence upon which reasonable men might differ as to negligence.

*Affirmed.*

KERN, Associate Judge, concurring in part and dissenting in part:

While I concur fully with Part I of the majority's opinion in rejecting the District's attempt to have us adopt the so-called "prior notice" rule, I am unable to agree with its affirmance in Part II of the trial court's entry of a judgment in favor of the District notwithstanding the jury's verdict in favor of appellant in his suit to recover for personal injury concededly suffered as the result of a stabbing by fellow inmates at Lorton.

As I understand the evidence presented to the jury and summarized in the District's brief, Lorton had established, at the time appellant was knifed, a so-called "critical

minimum" of 51 correctional officers at 51 *specific* posts about the facility for the purpose of maintaining security and order for the period of time each day from 3:30 p. m. to midnight. The Acting Watch officer on the night in question assigned the 51 officers who reported for duty to these 51 stations, six of which were immediately adjacent to each of the six dormitories housing some 40 inmates apiece on the so-called north walk. These six stations were the only points outside each of the six dormitories from which the activities inside could possibly be observed.

That particular night, each of the officers commenced the watch at each of the 51 stations provided for by Lorton's plan and to which each had been assigned by the officer in charge. Thereafter during the watch, various officers left their stations under orders to carry out other assignments—in the dining area, the relief of tower guards, driving buses to and from the facility and assisting at the visitors area and at the auditorium for the evening movie. Four of the officers left their "critical minimum" posts outside four of the dormitories; appellant was stabbed by other inmates while studying in one of those four dormitories left unattended by the departure of the officers from their posts.

There was other evidence, as the District details in its brief, that regular weekly searches of Lorton dormitories "often" produced one or two "shanks," and, since 1969, the FBI has investigated *each month* about three weapons assaults occurring in the facility.

The majority points out (Op. at 734), in affirming the judgment notwithstanding

---

**2.** We note, however, that even were we to assume with the dissent that the establishment by Lorton officials of the "critical minimum" number of correctional officers for this particular shift set the standard of reasonable care, there is no evidence demonstrating a breach of the required standard of care. As we noted above, within the bounds of the "critical minimum," Lorton security arrangements provided for flexibility in assignment of correctional officers. There were 51 officers on duty on the relevant evening, stationed in accordance with the requirements of inmate population movements. There was no testimony tending to show that these security arrangements deviated from the standard of ordinary care, nor other showing that it was unreasonable to allow flexibility in placement of correctional officers in accordance with inmate population movement. Thus there was insufficient evidence to allow the case to go to the jury on the issue of whether there was a breach of reasonable care by Lorton officials in this case.

the jury's verdict in favor of appellant, that "there was no expert testimony on the adequacy of the Lorton security arrangements *nor other showing* that it was unreasonable to allow flexibility in placement of correctional officers in accordance with inmate population movements." It seems to me, however, that there was *in effect* expert testimony presented at trial to the jury by the District itself as to what in the government's own view constituted security arrangements adequate for Lorton: 51 officers manning 51 specific stations around the facility were the critical minimum for the maintenance of adequate security at Lorton from 3:30 p. m. to 12 midnight. In light of this evidence, once appellant presented further evidence at trial that some correction officers were moved by the Watch Officer from some of these 51 critical stations Lorton had established, *as a minimum*, for the maintenance of security during this segment of the night, appellant had established a prima facie case of negligence.[1]

The District of course presented evidence in its defense at trial that this movement of the officers during the 3:30 to midnight watch to perform other duties, *viz.*, guard relief, bus driving, and supervision of other areas not among the critical minimum, such as the visitor's area and the movie theater, was essential to maintaining security. The jury then had to weigh and consider all the evidence in determining whether due care was exercised by Lorton under all the circumstances. Since reasonable men could reasonably disagree over whether the Watch Officer's movement of his officers from the 51 critical minimum security points on this particular night was the exercise of due care under all the circumstances and since we on appeal must view the facts in a light most favorable to appellant, I would conclude the jury properly took the case and allow its verdict to stand.[2]

Accordingly, I respectfully dissent from Part II of the court's opinion.

---

1. I would not disagree with the majority's conclusion that an expert would have been required to make a prima facie case for appellant at trial on an asserted theory that Lorton's plan was inadequate; here, however, appellant urges that Lorton's plan, *viz.*, "the 51 critical minimum" plan, was operated by Lorton on that night in negligent fashion.

2. Given the evidence adduced of (a) repeated armed attacks by inmates against other inmates over a long period of time and (b) the interior of the north walk dorms could only be observed from the "critical minimum" posts outside each dorm, I view proximate cause to have been established.