Michael HAITH, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 84–135.

District of Columbia Court of Appeals.

Argued Feb. 26, 1987.
Decided May 22, 1987.

Cassandra P. Hicks, Rockville, Md., with whom Irwin G. Meiselman and Samuel M. Shapiro were on the brief, for appellant.

Michele Giuliani, Asst. Corp. Counsel, Washington, D.C., with whom James R. Murphy, Acting Corp. Counsel at the time the brief was filed, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Deputy Corp. Counsel, were on the brief, for appellee.

Before MACK, FERREN and TERRY, Associate Judges.

TERRY, Associate Judge:

Michael Haith, a prisoner at the District of Columbia's Lorton Reformatory, was beaten and stabbed one night by four fellow inmates. He sued the District, alleging that it had been negligent in failing to provide adequate training and supervision for its correctional officers and in various aspects of its management and operation of the Lorton facility. The jury found in favor of the District, and Haith noted this appeal. Finding error in the trial court's instructions to the jury, we reverse the judgment and remand the case for a new trial.

### I

In December 1980 Michael Haith was convicted of second-degree burglary and sentenced to a three- to twelve-year term of imprisonment in Lorton Reformatory. After he had been at Lorton for about a year, he discovered that an acquaintance from his old neighborhood, Robert Johnson, had recently begun to serve a sentence there. It was William Johnson, Robert's brother, who had informed the police of the burglary of which Haith had been convicted. Haith testified, however, that he had no reason to believe Robert Johnson might harbor any feelings of hostility toward him.[1] He therefore did not inform the prison authorities of any potential danger due to Robert's arrival.

Shortly after 9:00 p.m. on February 23, 1982, the eve of Haith's scheduled transfer to a minimum security unit within the Lorton complex, Haith noticed that his laundry was not in its customary place beside his bed. He left dormitory No. 4, where he resided, and went to dormitory No. 16 to speak to Alphonso Brown, another inmate who regularly did Haith's laundry. Haith testified that he passed two empty and padlocked guard shacks on his way to see Brown, although he did see a guard at quarter post No. 3, which was directly in front of dormitory No. 16.[2] Haith also said that a number of the lights outside the dormitories were not operating.

When Haith arrived at dormitory No. 16, he stuck his head inside the door and spoke to a friend and fellow inmate, Gregory Gary. Gary told Haith that Brown was in the shower, but that his laundry would be ready in about five or ten minutes. Haith decided to wait outside on a ledge in front of the dormitory.

As he waited, Haith was suddenly attacked by four other prisoners. Haith testified that he was struck on the back of the head with a piece of pipe. The assailants, three of whom wore masks, also stabbed him several times with homemade knives and tried to drag him between dormitory No. 16 and the adjacent dormitory No. 18. As Haith struggled to free himself, he screamed for help, but no one came to his aid.[3] After about three minutes, Haith managed to break loose and run away. Before he fled, however, he pulled the mask off one of his attackers, whom he recognized as Robert Johnson. Haith testified that Johnson said to him, "I'm going to kill you," and that Johnson was the one who had initially hit him in the head with the pipe. He later identified the assailant who wore no mask as Freddie Davis.

Although the prison infirmary was closer than dormitory No. 4, Haith ran back to his own dormitory and "collapsed." Two other inmates then took him to the infirmary, where he was questioned by two correctional officers, Lieutenant Eugene Haywood and Officer William Fontaine. According to Haywood and Fontaine, Haith told each of them that he had been hurt "playing" in dormitory No. 4. At trial Haith denied making these statements.

Eugene Miller, a penology expert, testified in response to a hypothetical question that if there were no guard in quarter post No. 3 or on the main walkway at the time of the assault, the "officer supervision" of the prisoners would not conform to "proper penological procedures." Miller also criticized the laxity of the prison's searches for contraband, particularly weapons, and said that the response by prison guards to the assault was inadequate. According to Miller, if these deficiencies had not existed, there was a "good likelihood" that the attack on Haith could have been prevented, or at least "interrupted" before Haith was seriously injured.

---

1. Leatha Haith, Michael Haith's mother, testified that Robert Johnson's sisters had been visitors in her home since Michael had gone to prison, and that she had never had any "complication" with Robert's mother over the fact that William Johnson had identified her son as a burglar.

2. Another inmate testified, however, that there were never any officers in quarter post No. 3.

3. While the fight was in progress, Gregory Gary opened the door to dormitory No. 16; but when he saw what was going on, he shut the door and went back inside.

The District countered Miller's testimony with that of Major James Black, the Chief of Security for the District of Columbia Department of Corrections. Although he did not testify as an expert, Black said in essence that the various security policies and practices at Lorton were adequate. Appellant objected that several portions of Black's testimony were unqualified expert opinion.

Lieutenant Gerald Collins, another correctional officer, also testified for the District, although he was not listed as a witness in the pre-trial order. Collins said that he had been on duty at quarter post No. 3 at the time the assault allegedly took place. Although he had a clear view of the front of dormitory No. 16 from his post, he said that he had seen no disturbance that night and had no reason to believe that an assault had occurred.

The court gave standard jury instructions on negligence and proximate cause. The jury also heard an instruction tailored for prison assault cases, proffered by the District, which discussed the general philosophy of prison management and explained that, because of the assaultive tendencies of convicts, rehabilitation necessarily involves "calculated risks." Appellant's counsel objected to this instruction, but the court overruled the objection. Finally, the court instructed the jury on contributory negligence and assumption of risk.

The jury returned a verdict in favor of the District. On appeal Haith contends that the trial court's instruction on the "calculated risks" involved in rehabilitating criminals was improper, as well as the instructions on assumption of risk and contributory negligence. He also asserts that the trial court committed several errors in its evidentiary rulings. Finding reversible error in the special instruction on "calculated risks," we do not consider appellant's other arguments, since our remand for a new trial makes them all moot.

## II

■ In the District of Columbia, and in every other jurisdiction of which we are aware, penal authorities are under a duty to protect and safeguard the prisoners entrusted to their custody. *Matthews v. District of Columbia*, 387 A.2d 731, 734 (D.C. 1978); *see District of Columbia v. Cooper*, 483 A.2d 317, 322 (D.C.1984). Unfortunately, many prisoners are dangerous people, and the residents of a place like Lorton Reformatory cannot expect a risk-free environment. "Prison personnel are not ... insurers of an inmate's safety." *Hughes v. District of Columbia*, 425 A.2d 1299, 1302 (D.C.1981), citing *Matthews, supra.* Thus, when a prisoner is assaulted by some of his fellow prisoners, the District is not *ipso facto* liable for his injuries. The injured inmate must show that the District breached its duty to protect him from harm, and that his injuries were a proximate result of that breach. *Hughes, supra,* 425 A.2d at 1302.

■ The trial court in this case did not give the jury a clear, concise instruction on these principles. Instead, the court, at the prompting of the District, offered the following comments on the problems facing prison authorities:

In weighing these matters, you are instructed that some aspects of prison life seek to encourage rehabilitation and responsible conduct by prisoners, and thus inevitably involve calculated risks. Many of those incarcerated have assaultive tendencies. And one way to minimize prison episodes might be by complete isolation, which is not only physically impossible but also might be least likely to induce positive attitudes in, and rehabilitation of, persons so treated. One takes calculated risks in this life. And this is also inherent in allowing, for example, prisoners to intermingle and interact ... in ... housing, work, recreation, and religious worship and other activities so that prisoners may learn to get along with other persons as part of a rehabilitative process.

The result may be inevitable that from time to time there occurs an episode in which a reasonable risk results in loss and another prisoner is injured. Stated another way, the demands of effective

penal administration and rehabilitation may afford prisoners less than absolute security from harm at the hands of other inmates.

This passage more closely resembles a closing argument than a jury instruction. We hold that the District injected error into the case by requesting it, and that the court committed error by acceding to that request.

■ "An instruction must be simple, brief, impartial and free from argument." *Paul v. Safley Construction Co.*, 287 Ark. 412, 413, 700 S.W.2d 55, 56 (1985) (citation omitted); *accord, e.g., Montieth v. Atchison, T. & S.F. Ry.*, 151 Cal.App.2d 442, 456, 311 P.2d 886, 894 (1957); *Bechard v. Concrete Mix & Construction, Inc.*, 218 Kan. 597, 600–01, 545 P.2d 334, 337 (1976); 75 Am.Jur.2d *Trial* § 621 (1974); 88 C.J.S. *Trial* § 336 (1955). Trial courts should therefore "leave the matter of argument to counsel for the respective parties." *Montieth, supra*, 151 Cal.App.2d at 456, 311 P.2d at 894. Although the challenged instruction in this case did not contain any erroneous statements of law, it nevertheless focused the jury's attention on the difficulties of running a prison, matters which were not properly of concern to this jury. The mere fact that an instruction correctly reflects the law (or does not misstate the law) does not necessarily mean that the judge should deliver it; if the instruction is argumentative, it is not for the jury to hear. *See, e.g., Thomas v. Barnett*, 107 Ga.App. 717, 729–31, 131 S.E.2d 818, 827 (1963); *Gordon v. Chicago Transit Authority*, 128 Ill.App.3d 493, 501, 83 Ill.Dec. 743, 749, 470 N.E.2d 1163, 1169 (1984); *Illinois State Trust Co. v. Walker Mfg. Co.*, 73 Ill.App.3d 585, 591–92, 29 Ill.Dec. 513, 518, 392 N.E.2d 70, 75 (1979); *Walker v. Ferris*, 241 Miss. 63, 73, 128 So.2d 865, 870 (1961).

The District relies heavily on *Fleishour v. United States*, 244 F.Supp. 762 (N.D.Ill. 1965), *aff'd*, 365 F.2d 126 (7th Cir.), *cert. denied*, 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448 (1966), to sustain the contested instruction. *Fleishour* was an action under the Federal Tort Claims Act in which an injured prisoner alleged that federal prison authorities had negligently placed him in a large unguarded dormitory with a dangerous mental defective, who assaulted him two days later, causing serious injury. In ruling on the merits in favor of the United States, the court said:

[A]ll aspects of prison life which seek to encourage rehabilitation and responsible conduct by prisoners inevitably involve calculated risks. Most of those incarcerated have greater or lesser assaultive tendencies, and the only certain way to insure against prison episodes is by complete isolation, which is not only physically very difficult, if not impossible, but also least likely to induce positive attitudes in and the rehabilitation of persons so treated.

Accordingly, it is, we are told, standard practice in modern penal institutions to take calculated risks in various aspects of prison life, housing, work, recreation, religious worship and others, so that prisoners may learn to get along with other persons as part of the rehabilitation process. The result is that, from time to time, there occurs an episode such as that here involved in which the gamble is lost and another prisoner is injured.

*Id.*, at 767.

The reader will quickly see that this quotation is quite similar to the instruction at issue here. But it is risky business for a trial court simply to lift a paragraph or two from some opinion for use in an instruction. The fact that the opinion may have been written by a distinguished jurist, as *Fleishour* was, "is no guarantee that [the quoted language] is not argumentative, negatory, or prolix." *Bell v. Seatrain Lines, Inc.*, 40 Cal.App.3d 16, 27, 115 Cal.Rptr. 76, 82–83 (1974). "Statements in opinions are often couched in argumentative language and may be formulated in words expressive of policy. As such they may mislead a jury. It is better to charge a jury in terms of legal standards and rules." *Slavish v. Ratajczak*, 277 Pa.Super. 272, 277, 419 A.2d 767, 770 (1980); *accord, Thornton v. CAMC, Etc.*, 305 S.E.2d 316, 325 (W.Va. 1983). Language from a judicial opinion which is argumentative, albeit legally cor-

rect, should therefore not be used in a jury instruction. This was the trial court's error.

■ There is, moreover, a significant difference between *Fleishour* and this case which makes the quoted language inapposite here. The passage from *Fleishour* is based on the expert testimony of "[a] number of penologists of long and extensive experience in both the Federal and state prison systems...." 244 F.Supp. at 767. In the instant case, however, the District presented no expert testimony whatever about the problems of prison management or the "calculated risks" that prison authorities must take in the course of their duties.[4] Consequently, the giving of this instruction was error on the additional, independent ground that it was without any evidentiary basis. *See Ceco Corp. v. Coleman*, 441 A.2d 940, 949 (D.C.1982) (instruction should not be given if there is no support for it in the evidence).

■ Finally, we cannot conclude on this record that the error in the instruction was harmless.[5] Although the court also told the jury "that in the taking of these calculated risks, the District of Columbia [may not] do so in a negligent manner and create unreasonable risks of harm," this clarification was inadequate, in our view, to negate the impact of the erroneous instruction. *See Dunn v. Marsh*, 129 U.S.App.D.C. 245, 248 n. 5, 393 F.2d 354, 357 n. 5 (1968).

The judgment of the trial court is therefore reversed, and this case is remanded for a new trial or for other proceedings consistent with this opinion.

*Reversed and remanded.*

---

**4.** Pertinent case law appears to require expert testimony on these subjects. *See Hughes v. District of Columbia, supra,* 425 A.2d at 1303. Major Black, the only witness for the District whose testimony even came close to these areas, did not testify as an expert. Furthermore, his testimony was focused on the events of February 23 and the adequacy of the security systems at Lorton on or about that date, not on the broader questions of penology and prison administration with which the instruction deals.

**5.** We note that the District does not make a harmless error argument.