**DISTRICT OF COLUMBIA, Appellant,**

v.

**David CARMICHAEL and Henry
Johnson, Appellees.**

**No. 88–47.**

District of Columbia Court of Appeals.

Argued Dec. 12, 1989.

Decided July 3, 1990.

Edward E. Schwab, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, for appellant.

Steven R. Kiersh, with whom Russell F. Canan and Karen M. Schneider were on the brief, for appellees.

Before TERRY, SCHWELB, and FARRELL, Associate Judges.

TERRY, Associate Judge:

Appellees Carmichael and Johnson, inmates of the District of Columbia's maximum security prison at Lorton, Virginia, were assaulted by several of their fellow prisoners. They received multiple stab wounds and required surgery and extended hospitalization. A few months later they brought this negligence action against the District of Columbia, basing their claim on D.C.Code § 24–442 (1989).[1] Their main contention was that their injuries resulted from the District's failure to control the supply of contraband weapons within the prison.

At trial appellees relied heavily on the testimony of an expert witness. The District twice moved for a directed verdict, arguing each time that appellees had failed to offer sufficient evidence to support a finding of negligence. The trial court denied both motions and submitted the case to a jury, which awarded $75,000 to Carmichael and $100,000 to Johnson. The court later denied the District's post-trial motion for judgment notwithstanding the verdict.

On appeal the District argues that appellees' evidence was insufficient to prove negligence because it failed to establish a

---

1. D.C.Code § 24–442 states in pertinent part: [The] Department of Corrections under the general direction and supervision of the Mayor of the District of Columbia shall have charge of the management and regulation of ... the Reformatory at Lorton ... and be responsible for the safekeeping, care, protection, instruction, and discipline of all persons committed to such [institution].

standard of care by which the jury might have determined that the District was negligent. We hold that the evidence was indeed insufficient, and that the testimony of appellees' expert did not prove a standard of care relating to the control of contraband weapons in a maximum security prison such as Lorton. We therefore reverse the judgment of the trial court and remand the case with directions to enter judgment for the District of Columbia.[2]

I

Shortly after 11:00 a.m. on February 1, 1985, David Carmichael and Henry Johnson were attacked as they entered a recreation yard in the maximum security facility at Lorton. Approximately eight other inmates took part in the assault, which resulted in two stab wounds to Carmichael and three to Johnson. Both men required immediate surgery, and both spent over two weeks in the hospital. Undisputed evidence showed that the injuries were caused by prison-made weapons known as "shanks."[3] While only two shanks were recovered after the assault, appellees testified that all of their assailants had contraband weapons of some type.

Appellees called James E. Murphy as their only expert witness. Mr. Murphy, who had held several positions with the United States Bureau of Prisons and in the private sector as a consultant over a period of thirty-two years, was accepted by the court as an expert in the field of penology. Murphy testified that the District was negligent because it failed adequately to con-

trol contraband weapons within the maximum security prison at Lorton. He specifically referred to the monthly logs of recovered contraband for January and February 1985. These reports revealed that five sharp instruments—three shanks, one straight razor, and a pair of scissors—were recovered from inmates during January and that two shanks were recovered in February.[4] In forming his opinion that "there was obviously a failure to control contraband," Murphy said that he relied on the monthly logs, on appellees' testimony that all of their assailants had weapons, and on unspecified standards promulgated by the American Correctional Association (ACA) and the District's own regulations, as well as his own considerable experience with prisons around the country. Murphy also described procedures used to restrict contraband in the federal penitentiary at Marion, Illinois, where he had once served as associate warden,[5] and he noted that "it is not uncommon on my visits [to Lorton] and in talking with employees of the place ... that the metal detectors are out of order, [and that there are no] safety vestibules in the cell blocks."

After the presentation of the plaintiffs' case, counsel for the District moved for a directed verdict, noting that "the plaintiffs have not presented evidence that [the duty owed] by the District of Columbia has been breached." At the end of the trial, before the jury began its deliberations, counsel again moved for a directed verdict, arguing that the expert had failed to state the basis for his assertion that the discovery of five potential weapons in January and four po-

2. The District also argues that the trial court failed to conduct an adequate *voir dire* of eight jurors who read or heard news reports about verdicts against the District in two similar cases. Because we hold that appellees' case should not have gone to the jury in the first place, we do not reach this issue.

3. A shank is a sharp, pointed object fashioned from any material that can be made into a knife-like weapon. The production of these weapons appears to be restricted only by the materials available, which are virtually unlimited, and the native ingenuity of prisoners. Suitable materials include, for example, toothbrushes, pens, spoons, and pieces of metal or wood taken from bed frames.

4. The logs did not list the two weapons recovered after the assault on Carmichael and Johnson, however, because the FBI took charge of them.

5. When the court, at a bench conference, asked whether the penitentiary at Marion had been "established to be the state of the art, or the one by which all [others] are to be judged," appellees' counsel conceded that it had not. The court then remarked that "the fact that something is done one way at Marion, possibly a different way than at Lorton, does not necessarily mean that one or either is right."

tential weapons in February (the two listed in the logs and the two recovered from the assailants) was indicative of an excessive number of contraband weapons in the system. Counsel asserted, "I never got any clear indication from Mr. Murphy as to exactly what would be excessive in a prison defined as a maximum security facility." After the jury's verdict, the District moved unsuccessfully for a judgment n.o.v., again drawing attention to the insufficiency of the expert's testimony.[6]

## II

■■■ When a District of Columbia prisoner is assaulted by fellow prisoners, the District is not *ipso facto* liable for the resulting injuries. The injured inmate must show both that the District breached its duty to protect him from harm and that his injuries were a proximate result of that breach. *Haith v. District of Columbia,* 526 A.2d 17, 19 (D.C.1987). Furthermore, as this court has pointed out:

> The question of whether prison officials acted reasonably to secure the safety of an inmate is not one within the realm of the everyday experiences of a lay person. The reasonably prudent juror cannot be expected to appreciate the ramifications of prison security as well as the parallel considerations involving the safekeeping of prisoners, and therefore, whether, under given circumstances, reasonable care was exercised.... Thus, expert testimony or supporting evidence is necessary to establish that standard.

*Hughes v. District of Columbia,* 425 A.2d 1299, 1303 (D.C.1981) (citation omitted). Given the facts of this case and the claim of negligence made by appellees, expert testimony was essential. Appellees sought to meet their burden under *Hughes* by offering the testimony of James Murphy. After being accepted as an expert in penology, Mr. Murphy stated that in his opinion appellees' injuries were caused by the Dis-

trict's negligent control of contraband weapons in the maximum security prison at Lorton. The issue before us is whether Murphy's opinion was legally sufficient to enable the jury to find negligence. We hold that it was not.

In a case such as this, as in any negligence action, "[t]he plaintiff must establish by competent evidence a standard of care; that the defendant violated that standard; and that such violation proximately caused injury to the plaintiff." *Id.* at 1302 (citation omitted). When an expert's testimony is required, the expert must articulate and refer to a standard of care by which the defendant's actions can be measured. *Id.* at 1303; *accord, Toy v. District of Columbia,* 549 A.2d 1, 6 (D.C.1988); *District of Columbia v. Peters,* 527 A.2d 1269, 1273 (D.C.1987); *District of Columbia v. Davis,* 386 A.2d 1195, 1200 (D.C.1978). The failure to prove a standard of care is fatal because, in order to recover damages for negligence, "the plaintiff must prove that the defendant deviated from the applicable standard of care." *Toy, supra,* 549 A.2d at 6; *accord, Hughes, supra,* 425 A.2d at 1303 (plaintiff "must show ... that what occurred in the case at bar was a negligent deviation from the demonstrated acceptable standard"). If the standard itself is not proven, then a deviation from that standard is incapable of proof.

Mr. Murphy's testimony, even when viewed in the light most favorable to appellees, failed to establish *any* standard of care, and hence necessarily failed to show whether or how the District deviated from "the demonstrated acceptable standard." This failure is nowhere more apparent than in the following excerpts from Murphy's testimony on cross-examination:

> Q. Now, you made a general statement that there were too many shanks found at the maximum security facility.
> A. Yes.
> Q. Okay. Now, what are you basing that conclusion on, the fact that there were too many found?

---

lees a chance to respond to, its contention that the proof of the standard of care was legally insufficient. Under *Howard University v. Best,* 547 A.2d 144, 148 (D.C.1988), nothing more is required.

A. What I have read, my own experience, talking with staff at the maximum security facility.

\*   \*   \*   \*   \*   \*

Q. Now, could you tell me specifically, and I'll just try to clarify the question this time. Could you just tell me specifically why you consider that to be an unusual number of weapons? In other words, Mr. Murphy, I'd like to know, are you basing your information on some type of document, on some study? That's what I'm trying to get at.

\*   \*   \*   \*   \*   \*

A. It's based primarily on my own experience. It's my experience, when a knife, even at McNeill Island, for instance, which had over a thousand prisoners, when a knife was found, that was an event. Five in a month, that makes it a weekly occurrence.

These exchanges are typical of Mr. Murphy's failure to identify any concrete standard upon which a finding of negligence could be based. The reference to the federal penitentiary at McNeill Island, for example, gives no indication of whether McNeill Island and Lorton are comparable institutions. Similarly, Murphy's earlier testimony about the contraband logs was of no probative value. While he pointed out that nine weapons were confiscated at Lorton over a two-month period, he made no attempt to show that this number was any greater than at other comparable facilities. Apart from the reference to McNeill Island, the jury had no way of determining whether the number was high or low.

In like manner, Mr. Murphy's observation that the metal detectors at Lorton were frequently out of order failed to show whether it was normal for prisons even to have metal detectors. While one might think it reasonable for a maximum security facility to have metal detectors, such a belief, reasonable or not, is no substitute for a specific, articulable (and articulated)

standard of care. Critically absent from Murphy's testimony was any statement, for example, that a certain percentage of comparable facilities did have metal detectors, and that those metal detectors were customarily in service over certain periods of time. Without such evidence the jury had no basis for comparing Lorton with any other institution, and hence no basis for finding that Lorton's failure to have functioning metal detectors in place amounted to a deviation from a demonstrated standard of care.

Mr. Murphy also made a number of generalized references to ACA standards and District of Columbia regulations. He said that if these standards and regulations had been followed, less contraband would have been in circulation at Lorton. However, he did not identify, or even mention in passing, any specific standard or regulation.[7] Because he did not single out any particular provisions, we need not consider whether the ACA standards are a proper measure of whether the District's conduct at Lorton was negligent. All we need to say is that it was not enough for Mr. Murphy to base his opinions on the ACA standards. Rather, when normative standards are used by an expert as a basis for assessing negligence, at the very least the expert must be specific as to what standards were violated and how they were violated. This can be done only by comparing specific standards with specific facts or conduct. The same is true with respect to regulations. Murphy's opinion that Lorton failed to comply with District of Columbia regulations or ACA standards, unaccompanied by any evidence of what those regulations or standards provide, was insufficient to prove that the District violated an applicable standard of care.

What happened here was essentially what happened in *Toy v. District of Columbia, supra.* In this case as in *Toy*, an expert relied on his own experience and on anecdotal observations to form an opinion, but failed to provide any basis in his testi-

---

7. For example, Mr. Murphy testified that there was "a failure to control inmate movement, and that is covered in one or more standards from the American Correctional Association." He did not specifically identify any standards relating to inmate movement, however, nor did he say how movement could or should have been controlled differently. Furthermore, he admitted on cross-examination that the District was under no legal duty to abide by the ACA standards.

mony by which *the jury* could determine what the standard of care was and how the District's conduct deviated from it. The *Toy* court illustrated the shortcomings in the expert testimony by comparing it with the evidence in *District of Columbia v. Peters, supra,* in which another expert "testified that many police departments train their officers to handle mentally disturbed persons and persons under the influence of drugs [and] gave as examples specific law enforcement agencies which provide such training." *Peters, supra,* 527 A.2d at 1273. The expert in *Peters* "also testified that he knew of no metropolitan police department, other than the District's, which provided no [such] training whatsoever...." *Id.* Mr. Murphy's testimony in the case at bar, like that of the expert in *Toy,* fell far short of this kind of showing.

We hold that the testimony of appellees' expert, Mr. Murphy, failed to establish a standard of care by which a trier of fact could measure the conduct of the District and determine whether that conduct deviated from the standard. For all we know, Mr. Murphy may have had an objective standard in mind when he testified, but he never communicated it to the jury.[8] There was no other evidence relevant to that issue. Without sufficient proof of the standard of care, appellees' case should never have gone to the jury. *Meek v. Shepard,* 484 A.2d 579, 582 (D.C.1984); *Hughes v. District of Columbia, supra,* 425 A.2d at 1302. Accordingly, we reverse the judgment in favor of appellees and remand this case to the trial court with directions to enter judgment for the District of Columbia.

*Reversed and remanded.*

---

8. We note that Mr. Murphy was also the plaintiff's sole expert witness in a recent case with similar facts, in which we affirmed a verdict and judgment against the District. In *District of Columbia v. Bethel,* 567 A.2d 1331 (D.C.1990), a prisoner at Lorton was stabbed with a shank by a fellow inmate. Mr. Murphy testified that the District was negligent in six different ways in its management of the prison, and that the Dis-

trict's negligence was the proximate cause of Bethel's injuries. He also "testified that the District had failed to adhere to the applicable standard of care in each of these six respects." *Id.* at 1333. In the instant case, however, there was no corresponding testimony from Mr. Murphy about the standard of care. If he had testified here as he did in *Bethel,* this would be a very different case.