DISTRICT OF COLUMBIA, Appellant,

v.

Victor MORENO, Appellee.

No. 92–CV–1569.

District of Columbia Court of Appeals.

Argued May 26, 1994.
Decided Sept. 8, 1994.

Karen L. McDonald, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, for appellant.

W. Gary Kohlman, Washington, DC, for appellee.

Before STEADMAN and KING, Associate Judges, and GALLAGHER, Senior Judge.

GALLAGHER, Senior Judge:

Appellee Victor Moreno, an inmate of the District of Columbia's maximum security prison at Lorton, Virginia, was assaulted by several people (presumably other prisoners). He received multiple stab wounds to his back and legs which required surgery, the removal of a kidney and extended hospitalization. On July 30, 1990, appellee brought a negligence action against the District of Columbia. He sought $250,000 in compensatory damages and $250,000 in punitive damages.

At trial, appellee relied upon the testimony of an expert to establish the District's departure from the standard of care. The District of Columbia moved for a directed verdict arguing that the appellee had failed to produce sufficient evidence to establish a claim of negligence. Specifically, the District argued that the appellee had not established a standard of care that the District could be held to have violated. The motion for directed verdict was denied. The District renewed the motion for a directed verdict upon the close of all the evidence. This motion was also denied.

The jury returned a verdict for appellee and awarded Moreno $750,000 in damages. The District moved for a judgment notwithstanding the verdict, or in the alternative, for remittitur or a new trial. These motions were denied. The District of Columbia appeals the judgment entered by the Superior Court, and the court's refusal to grant the judgment notwithstanding the verdict, or in the alternative a new trial. On appeal the District argues that appellee's evidence was insufficient to prove negligence because the appellee through its expert failed to establish a standard of care by which the jury might have determined negligence.

## I.

In 1988, Victor Moreno was housed in Cellblock 2 of the Maximum Security Facility at Lorton Prison. He had been an inmate at the facility since 1983. Cellblock 2 contained four tiers (upper and lower left and right tiers) of twenty-five single inmate cells. Moreno was in cell 25 of the upper right tier, the cell farthest from the control tower that separates the tiers.

On July 13, 1988, at approximately 9:00 p.m., the guards conducted a "count" of Cellblock 2. During the "count" all inmates are required to return to their cells, the cell doors are locked and one of the two guards walks the tier to ensure that the proper inmates are present and in their cells. If an inmate is missing the count is suspended until the missing inmate is located. The officer who is walking down the tier manually checks the cell doors to see if they are locked. Once the count is completed the second guard (at the control box) locks the controls for that tier and the two guards move to the next tier to conduct the count there.

On the night in question, July 13, 1988, Officers Pulley and Smith conducted the count on the upper right tier where Moreno was housed. Moreno testified that after the count his cell door opened automatically. Moreno entered the tier, looked down the tier, and saw a correctional officer at the control panel. He started walking down the tier and when he was halfway down the tier the officer left the panel box. Moreno proceeded up the tier and was handed a phone by another inmate, who informed him that it was "phone time." Moreno walked to a friend's cell and asked if the friend needed any calls made and then placed a call for the friend. On his way back to his cell, after relaying the outcome of the phone call to his friend, Moreno felt a sharp pain in his back. Moreno turned around and saw three masked individuals with knives. He tried to

fight them off and received three additional stab wounds all to his legs.

Moreno returned to his cell bleeding, grabbed a blanket from his cell, wrapped it around the wound in his back and then proceeded to the entrance of the tier. Moreno banged on the door and an officer appeared. Upon returning with assistance, several guards removed Moreno. He was first taken to the infirmary, then to Dewitt Army Hospital, and ultimately to D.C. General Hospital. At D.C. General, Moreno underwent surgery that included the removal of a kidney.

Moreno's expert, Dr. E. Eugene Miller, testified that the American Correctional Association standards provide national guidelines for prison administration. Dr. Miller testified that the District fell below the standard of care in four areas: (1) the adequacy and/or proper maintenance of the cell locking system; (2) inmate control of the telephone; (3) failure to control inmates' possession of contraband; and (4) the regulation of inmate movement. Specifically regarding inmates' possession of contraband, Dr. Miller testified about the prison's shakedown policy. A shakedown is when the prison officials search a group of cells for contraband. According to Dr. Miller, these shakedowns should be random and unannounced. However, Dr. Miller testified that the shakedowns at Lorton only occurred during shift changes and thus the inmates would know when a shakedown would occur. The only randomness in Lorton's procedure was which cell groups were to be searched. Dr. Miller testified that the searches should be unannounced and irregularly timed, not just unannounced as at Lorton.

Mr. Gary Hilton, the assistant commissioner of the New Jersey Department of Corrections, testified as a penological expert for the District. He disagreed with Dr. Miller on whether the District had breached the standard of care to Moreno in any of the four areas—cell locking system, inmate control of the telephone, possession of contraband, and inmate movement. Mr. Hilton testified that the District's actions were appropriate and within national norms and practices. Specifically in regard to shakedowns he testified that because the cell groups are randomly searched the standard of care was not breached.

The jury determined that the District was negligent and awarded Moreno $750,000.00. The District moved for a judgment notwithstanding the verdict or, in the alternative, for remittitur or a new trial, claiming the award was excessive. The trial judge denied these motions. The District appeals the jury's verdict and the denial of the judgment notwithstanding the verdict. The District argues the following on appeal:

1. That Dr. Miller's testimony failed to provide the jury with specific standards and how the district violated these standards for all four alleged violations of the standard of care—the locking mechanism, inmate control of the telephones, control of contraband, and control of inmate movement;

2. That even if the standard of care was established by the expert the control of contraband is immune to tort liability since the prison's decision to conduct shakedowns at shift time is a discretionary decision that does not constitute a waiver of sovereign immunity; and

3. The trial court erred in refusing to give an assumption of risk instruction in addition to the contributory negligence instruction.

## II.

■ Penal authorities at Lorton "are under a duty to protect and safeguard the prisoners entrusted to their custody." *Haith v. District of Columbia*, 526 A.2d 17, 19 (D.C.1987). However, many prisoners are dangerous individuals and a penal facility, such as Lorton, is often not risk-free. *Id.* "Thus when a prisoner is assaulted by some of his fellow prisoners, the District is not *ipso facto* liable for his injuries. The injured inmate must show that the District breached its duty to protect him from harm, and that his injuries were a proximate result of that breach." · *Id.*

"The question of whether prison officials acted reasonably to secure the safety of an inmate is not one within the realm of the everyday experiences of a lay person."

*Hughes v. District of Columbia*, 425 A.2d 1299, 1303 (D.C.1981). Thus, this court has concluded that

> The reasonably prudent juror cannot be expected to appreciate the ramifications of prison security as well as the parallel considerations involving the safekeeping of prisoners, and therefore, whether, under given circumstances, reasonable care was exercised.... Thus, expert testimony or supporting evidence is necessary to establish that standard.

*District of Columbia v. Carmichael*, 577 A.2d 312, 314 (D.C.1990) (quoting *Hughes, supra*, 425 A.2d at 1303).

"When an expert's testimony is required, the expert must articulate and refer to a standard of care by which the defendant's actions can be measured." *Carmichael, supra*, 577 A.2d at 314; *accord, Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C.1988); *District of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C.1987); *Hughes, supra*, 425 A.2d at 1303; *District of Columbia v. Davis*, 386 A.2d 1195, 1200 (D.C.1978). In speaking of prison negligence cases, this court has stated:

> The failure to prove a standard of care is fatal because, in order to recover damages for negligence, "the plaintiff must prove that the defendant deviated from the applicable standard of care." *Toy, supra*, 549 A.2d at 6; *accord, Hughes, supra*, 425 A.2d at 1303 (plaintiff "must show ... that what occurred in the case at bar was a negligent deviation from the demonstrated acceptable standard"). If the standard itself is not proven, then a deviation from that standard is incapable of proof.

*Carmichael, supra*, 577 A.2d at 314.

### III.

■ Given the facts of this case and the claim of negligence, expert testimony was essential. "Where expert testimony is necessary, however, it is not sufficient if it consists merely of the expert's opinion as to what he or she would do under similar circumstances." *Toy, supra*, 549 A.2d at 7. Appellee offered the testimony of Eugene Miller, an expert in penology. Mr. Miller stated that the District of Columbia did not provide

an adequate standard of care. He identified four areas where the District of Columbia failed to meet the standard of care—the doors locking, inmate control of the telephone, inmate movement during count time, and control of contraband. The issue before us is whether Mr. Miller's opinion was legally sufficient to enable the jury to find negligence. We hold that it was not.

Mr. Miller's testimony, when viewed in the light most favorable to the appellee, failed to establish any standard of care, and therefore failed to show how the District of Columbia deviated from the standard of care. This failure to establish a standard of care is apparent from the following excerpts from Mr. Miller's testimony:

> First of all, the fact that the doors—there is no way to tell whether or not the doors were locked or not. That either indicates that you have got a very very faulty security door system which needs immediate repair or replacement, or else you need to change the procedure so you check the doors somehow so you can tell whether or not they are locked. Here you are talking about a cellblock in a maximum security prison, and it is absolutely essential for the security and safety both of the inmates and the staff that when people are supposed to be locked in their cells, they are in fact locked in. There is no way of telling that if you don't know whether the doors are locked.

> \*   \*   \*   \*   \*   \*

> In terms of inmate controlling the phone, that also is a dangerous practice in a prison, in that in effect, obviously phone time in a prison setting is a very valuable commodity. It is one of the few things to look forward to. Phone time becomes of paramount importance to many of the inmates. Consequently, he or she who controls the phone and the allocation of phone time winds up with a fair amount of power and control within that cellblock. Consequently, if an inmate is in charge of it, you are in fact giving control of inmates to another inmate, which is an extremely dangerous and bad practice in any kind of prison environment.

I might also add that that specific practice of putting inmates in control of other inmates is in specific violation of an American Correctional Association Standard.

Q. Let me ask you, on the first point you made as far as the failure to make sure that the doors were in fact adequately locked, does the American Correctional Association also speak to the question of regulating inmate movement; are there standards that are applicable there too?

A. Yes.

Q. And would a system that allows inmates to move either during the count time because the doors are faulty, would that be consistent with the American Correctional Association Standards?

A. The American Correctional Association Standard on inmate movement does not refer to the doors opening or closing. They are talking about a somewhat different kind of movement. I think here where you are talking about doors opening and closing, you would be talking about standards relating to proper maintenance of security equipment. You would also be talking about plain old common sense.

\* \* \* \* \* \*

There is also the whole question of control of contraband.... Part of the problem I see, again referring back to your hypothetical, is that the institution basically conducts regular shakedowns. The problem is they conduct them on a very predictable pattern, in that they always come at shift change either in the morning or the afternoon, between seven-thirty and eight in the morning, or three-thirty and four in the afternoon. So they become extremely predictable to the inmate. There is no element of surprise. Even though you are conducting a shakedown, its effectiveness is essentially negated because the inmates know when a shakedown is coming. They know if I hide my weapon, shank or other contraband between those periods of times, I have a pretty good chance no one will search for this particular thing the rest of the 24 hours. Again, this would be violative of proper prison procedure and it also specifically contradicts one of the American Correctional Standards concerning shakedowns and one of the specific things called for in that standard is that they are conducted at regular times.

This testimony reveals Mr. Miller's "failure to identify any concrete standard upon which a finding of negligence could be based." *Carmichael, supra,* 577 A.2d at 315. Mr. Miller failed to provide information regarding comparable facilities and how they might run their facilities. He vaguely referred to standards of the American Correctional Association, but failed to elicit what those standards said, rather he only concluded that the District of Columbia violated those standards. Nor did he inform the jury about how security procedures could be changed. Mr. Miller's testimony fell measurably short of identifying any specific standards of care and how the District of Columbia departed from those standards. "[W]hen normative standards are used by an expert as a basis for assessing negligence, at the very least the expert must be specific as to what standards were violated and how they were violated. This can be done only by comparing specific standards with specific facts or conduct." *Id.* This was not done here.

Rather, Mr. Miller's testimony, although more detailed, is very similar to the expert's testimony in *Carmichael* that failed to provide a standard of care for the jury to determine negligence. In *Carmichael,* the expert "made a number of generalized references to ACA standards and District of Columbia regulations." *Id.* "However, he did not identify, or even mention in passing, any specific standard or regulation." *Id.* (footnote omitted). Nor did he make any comparisons to other similar facilities. In *Carmichael,* the expert's failure to articulate a standard of care resulted in a reversal of a verdict in favor of a prisoner and the entering of a judgment in favor of the District of Columbia. *Id.* Mr. Miller's testimony in this case is similarly lacking in providing specific standards and how they were violated by the District of Columbia.

Mr. Miller's testimony is also very similar to the expert's testimony in *Toy, supra,* 549 A.2d 1. In *Toy,* the expert "had reviewed a booklet published by the American Correc-

tional Association Accreditation Program and a suicide report by the National Center of Institutions and Alternatives in preparation for his testimony." *Id.* at 8. However, the expert generally "did not refer to these or any other written standards or authorities as support for his opinion regarding emergency equipment." *Id.* The court concluded that the failure to specifically refer to standards and the use of anecdotal observations was not enough to let the case go to the jury. Therefore, the court affirmed the judgment for the District of Columbia notwithstanding the verdict. Mr. Miller, in this case, also failed to specifically refer to standards. Rather, he briefly referred to standards without eliciting what the standards are or what they require.

On the other hand, this case is easily distinguished from *Peters, supra,* 527 A.2d 1269. In *Peters,* the expert in the field of criminology "testified that many police departments train their officers to handle mentally disturbed persons and persons under the influence of drugs. He also gave as examples specific law enforcement agencies which provide such training." *Id.* at 1273. The expert in *Peters* "also testified that he knew of no metropolitan police department, other than the District's, which provided no [such] training whatsoever...." *Id.* Mr. Miller's testimony in this case, like the expert in *Toy* and *Carmichael,* fell measurably short of this kind of showing. Mr. Miller's testimony failed to provide information regarding other maximum security prisons and how they provide for the safety of their inmates.

This case is also different than the expert's opinion in *District of Columbia v. Bethel,* 567 A.2d 1331 (D.C.1990). In *Bethel,* the same expert as in *Carmichael,* "testified that the District had failed to adhere to the applicable standard of care in each of these six respects." *Id.* at 1333. Specifically, the six areas were failure to control inmate movement, inmate authority over other inmates, failure to control contraband, failure to provide proper supervision of inmates, delayed response to an emergency and operating an overcrowded facility. The expert testified regarding specific standards including specific ACA standards. *Id.* at 1334. In this case,

however, Mr. Miller only generally referred to American Correctional Association standards, not to specific provisions and language. The expert in *Bethel* identified the standard of care in each of the six areas. However, in this case Mr. Miller fell short of identifying the standard of care in any of the four areas.

## IV.

We hold that the testimony of appellee's expert, Mr. Miller, failed to establish a standard of care by which a reasonable trier of fact could measure the conduct of the District of Columbia and determine whether that conduct deviated from that standard of care. "Without sufficient proof of the standard of care, appellees' case should never have gone to the jury." *Carmichael, supra,* 577 A.2d at 316 (citing *Meek v. Shepard,* 484 A.2d 579, 582 (D.C.1984); *Hughes, supra,* 425 A.2d at 1302). We cannot allow juries "to engage in idle speculation." *Hughes, supra,* 425 A.2d at 1303. Accordingly, we reverse the judgment in favor of appellee and remand this case for entry of judgment for the District of Columbia.

The District of Columbia raises two other issues on appeal. It argues that the District is immune from liability for the failure to control contraband since the shakedown procedure is a discretionary judgment at the policy and planning level rather than a ministerial action executing or implementing a policy decision, relying upon *McKethean v. WMATA,* 588 A.2d 708 (D.C.1991). In addition the District of Columbia argues that the failure to provide the requested assumption of the risk jury instruction was erroneous and merits a new trial. However, since we are remanding for entry of a verdict in favor of the District of Columbia we need not address either of these contentions. Accordingly, the judgment is

*Reversed and the proceeding is remanded for entry of judgment for the District of Columbia.*