Linda A. SMITH, Plaintiff,

v.

Mabel D. HADEN, Defendant.

Civ. A. No. 92–1899 (PLF).

United States District Court,
District of Columbia.

Dec. 23, 1994.

James G. Kolb, Washington, DC, for plaintiff.

Dwight D. Murray, Washington, DC, for defendant.

### OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

FRIEDMAN, District Judge.

This is a legal malpractice action that was tried before the Court without a jury over

four days. Plaintiff Linda Smith claims that she employed the defendant Mabel Haden, a lawyer, to file a civil action against Javis Odom in Anchorage, Alaska, and that Ms. Haden breached her duty by neither filing suit nor timely referring plaintiff to another attorney to file suit in Alaska prior to the running of the applicable statute of limitations. Ms. Smith alleges that Mr. Odom shot and killed her fiancee, Robert Byrd, in her presence and wounded her in the process. As a result, plaintiff claims she suffered long-lasting psychic injuries and post-traumatic stress disorder. Plaintiff's civil action against Mr. Odom is now time-barred.

Ms. Haden denies the existence of an attorney-client relationship between her and plaintiff with regard to the filing of a civil action against Mr. Odom. She says she agreed to represent Ms. Smith only to file a claim on Ms. Smith's behalf under the Alaska Victim's Compensation Act and that, as a result of that representation, plaintiff obtained the maximum award authorized under the Act. With respect to any possible civil action against Mr. Odom, Ms. Haden asserts that she had referred plaintiff to an Alaska attorney, Ashley Dickerson. Ms. Haden states that plaintiff's injuries and damages, if any, were not proximately caused by any acts or any omissions by the defendant but may have been caused by the acts or omissions of others or by plaintiff's contributory negligence or assumption of the risk, or may have been preexisting or caused by a supervening or intervening cause.

At trial, Linda Smith testified in support of her legal malpractice claim. Her counsel also called as witnesses the defendant, Mabel Haden, Esquire; John G. Gill, Jr., Esquire, a legal expert; Dr. Thomas Carl Goldman, an expert in the field of psychiatry; Javis Odom (by telephonic videotaped deposition de bene esse); and John Paul Wilson and Paul Zimmerman (by telephonic deposition), both representatives of State Farm Insurance Company.

Mabel Haden testified in her own defense. Her counsel also called Edwin C. Brown, Jr., Esquire, a legal expert; Dr. Neil Blumberg (by videotaped deposition), an expert witness in the field of psychiatry; Robin Alexander,

an employee of Ms. Haden's; and Ashley Dickerson, Esquire (by telephonic deposition de bene esse), an attorney licensed to practice in the State of Alaska.

A number of interesting factual and legal questions were presented by this case concerning the applicable standard of care, the extent of plaintiff's post-traumatic stress disorder, the nature and extent of possible supervening or intervening causes for Ms. Smith's condition, and the interpretation of the exclusionary clause in Mr. Odom's homeowners' insurance policy. In the end, however, the Court finds that this case turns on issues of credibility and finds the defendant Mabel Haden, Robin Alexander and Ashley Dickerson more credible than the plaintiff Linda Smith on the crucial factual issues in dispute. As a result, the Court finds that Ms. Haden limited the scope of her representation of Ms. Smith to representing her in connection with her claim under the Alaska Victim's Compensation Act and did not undertake to represent Ms. Smith in connection with a possible civil action against Mr. Odom.

### A. Preliminary Matters

At the close of trial, defendant renewed her motion for dismissal pursuant to Rule 50, Fed.R.Civ.P., and her motion to strike the testimony of plaintiff's legal expert, John G. Gill, Jr. Before setting forth its findings of fact and conclusions of law, the Court turns to these two preliminary matters.

### 1. Motion to Dismiss

By its terms Rule 50 only applies in cases tried to a jury. Rule 50(a), (b), Fed. R.Civ.P. Therefore, it is not appropriate to make a Rule 50 motion in a bench trial or for the Court to rule on such a motion. *See generally* 9 Wright and Miller, *Federal Practice and Procedure,* § 2523 (1971 and Supp. 1994); *Perkin–Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 895 (Fed.Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984). A motion to dismiss or for judgment before the conclusion of all the evidence is appropriate in a bench trial under Rule 52(c), Fed.R.Civ.P. That Rule permits the Court, during a trial without a jury, to enter judgment as a matter of law at any

time it can make a dispositive finding of fact on the evidence. Rule 52(c), Fed.R.Civ.P. In its discretion, the Court may wait until the close of all the evidence before ruling on a Rule 52(c) motion. Because defendant in this case waited until the end of the trial to move for judgment or dismissal, it is unnecessary for the Court to consider that motion and its authority under Rule 52(c). At the close of all the evidence, the Court's task remains unchanged—the Court must enter a judgment on the basis of its findings of fact and conclusions of law. Defendant's motion to dismiss therefore is denied.

### 2. Motion to Strike Expert Testimony

▓▓▓ In a legal malpractice case in the District of Columbia the plaintiff bears the burden of presenting evidence establishing that the parties entered into an attorney-client relationship, what the applicable standard of care is, that the standard of care has been violated by the defendant-lawyer, and that there was a causal relationship, or proximate cause, between the violation and the harm complained of—in this case, the loss of a judgment in some sum against Mr. Odom. *See Battle v. Thornton,* 646 A.2d 315, 318 (D.C.1994), *citing O'Neil v. Bergan,* 452 A.2d 337, 341 (D.C.1982); *Morrison v. MacNamara,* 407 A.2d 555, 560 (D.C.1979). To show that the negligence was the proximate cause of the injury, plaintiff must show that she had a good cause of action against the party she wished to sue; otherwise, the plaintiff "loses nothing by the conduct of [her] attorney even though the latter was guilty of gross negligence." *Niosi v. Aiello,* 69 A.2d 57, 60 (D.C.1949).[1]

▓▓▓ In actions involving negligence by attorneys, their conduct must comport with that degree of care reasonably expected of other legal professionals acting under the same or similar circumstances. *O'Neil v. Bergan,* 452 A.2d at 341; *Waldman v. Levine,* 544 A.2d 683, 688 (D.C.1988). Moreover, in order to make out a prima facie case of legal malpractice, the plaintiff must pres-

ent expert testimony establishing the standard of care by which the defendant-attorney's conduct can be measured. The requirement to produce an expert is excused only where the attorney's lack of care and skill is so obvious that the trier of fact can find negligence as a matter of common knowledge. *Mills v. Cooter,* 647 A.2d 1118, 1123 (D.C.1994); *Hamilton v. Needham,* 519 A.2d 172, 174 (D.C.1986); *O'Neil v. Bergan,* 452 A.2d at 341. Allowing a statute of limitations to run on a client's claim is an example of the kind of lack of care and skill that can be found as a matter of common knowledge. *O'Neil v. Bergan,* 452 A.2d at 342.

In support of her claim that Ms. Haden breached the applicable standard of care, plaintiff introduced the expert testimony of John G. Gill, Jr., to demonstrate the standard of care for an attorney who seeks to limit the scope of his or her representation of a particular client and who seeks to refer the client to another attorney for specific matters that may be related to the incident giving rise to the limited representation by the referring attorney. Mr. Gill also testified about both the litigation value and the settlement value of a timely filed suit against Mr. Odom. He based his opinion on the value of the case on his own experience in settling and trying medical and legal malpractice cases, his experience with Alaska cases, and a review of Alaska law jury verdicts. Gill Tr. at 14–17, 36–38.

Defendant argues that the testimony of plaintiff's expert should be stricken from the record, and not considered by the Court, for two reasons: (i) Mr. Gill's testimony regarding the standard for limiting the scope of an attorney's representation, for referring a client to another attorney and for adequately communicating to the client the fact of the limitation and the referral was based solely on Mr. Gill's own personal experience, and (ii) Mr. Gill's testimony regarding the settlement value of a timely filed suit against Mr. Odom is too speculative to be admitted.

1. In an opinion issued prior to trial, the Court ruled that collectibility is not an element of a legal malpractice claim in the District of Columbia and that the burden of proof on this issue

therefore is not on the plaintiff. Rather, the defendant must prove non-collectibility in a legal malpractice action in this jurisdiction. *Smith v. Haden,* 868 F.Supp. 1 (D.D.C.1994).

With respect to the applicable standard of care, Mr. Gill presented alternative lines of reasoning, depending upon whether the Court credits Ms. Smith's testimony or Ms. Haden's testimony. Mr. Gill testified that if the Court accepts Ms. Smith's testimony as true, then Ms. Haden breached the applicable standard of care by failing to file suit within the two-year Alaska statute of limitations. Gill Tr. at 11. On the other hand, if the Court accepts Ms. Haden's testimony as true, Mr. Gill testified that in his opinion Ms. Haden breached the standard of care by failing to adequately define the limited scope of her representation, by failing to properly refer plaintiff to another attorney to handle Ms. Smith's claim against Mr. Odom, and by failing to communicate clearly with the client that the representation was limited. Gill Tr. at 12–14.

Specifically, Mr. Gill testified that in the circumstances of this case, "the standard of care requires in writing a letter indicating that the scope of the limitation was somewhat less than working on everything that could legally be obtained from the incident or from the causes of action springing from the incident." Gill Tr. at 13. He testified that the written agreement between plaintiff and defendant (Pl.Ex. 1 and Def.Exh. 1) was unclear and "did not serve to clearly and reasonably communicate" the limited nature of defendant's representation. Gill Tr. at 12–13. In his opinion, a separate writing should have been given to Ms. Smith to clearly define the limited scope of the representation. Gill Tr. at 13, 32–34. Mr. Gill further testified that in his opinion "the standard of care [for a referral] requires a more formal referral to it in writing and a communication to the client in writing" that would explain the referral "and that the case is referred to

Attorney Dickerson in Alaska, the name, address, phone number" and that the writing must inform Ms. Smith about the running of the statute of limitations. Gill Tr. at 13–14.

 Case law in the District of Columbia, not relating to attorneys as experts, requires that an expert witness testifying about the appropriate standard of care must articulate and refer to an objective standard by which the defendant's actions can be measured. *District of Columbia v. Carmichael,* 577 A.2d 312, 314–316 (D.C.1990). The expert must provide specific normative standards or concrete examples by which the fact-finder can evaluate the defendant's conduct. *Id.* As the court explained in *Toy v. District of Columbia,* 549 A.2d 1, 7 (D.C. 1988), an expert must testify as to a factual basis beyond the expert's opinion upon which the trier of fact can evaluate the defendant's conduct. It is not sufficient if the expert's testimony "consists merely of the expert's opinion as to what he or she would do under similar circumstances." *Id.*

 Mr. Gill's testimony established that he is an expert in legal malpractice. There was no objection to his testifying as an expert. Gill Tr. at 7–8. Beyond establishing his expertise and stating his opinion under the two alternative scenarios, however, the only objective or normative standard to which he referred in discussing the applicable standard of care was Disciplinary Rule 6–101(A)(3) of the Code of Professional Responsibility then in effect in the District of Columbia. Gill Tr. at 11. That Disciplinary Rule would be relevant, he said, under his first scenario, namely, that Ms. Smith had in fact engaged Ms. Haden to bring a civil action against Mr. Odom in Alaska.[2]

**2.** Mr. Gill based his opinion in part on Disciplinary Rule DR 6–101(A)(3), which provided that "A lawyer shall not ... [n]eglect a legal matter entrusted to him." Defendant objected to this testimony in part because a breach of DR 6–101(A)(3) cannot independently form the basis for a legal malpractice action. While it is true that a Disciplinary Rule cannot independently provide the basis for a claim, the standards set by the District of Columbia Court of Appeals in the Code of Professional Responsibility and Disciplinary Rules it adopts for lawyers licensed to practice in this jurisdiction may be relevant to

establishing the standard of care governing attorney conduct. *See Waldman v. Levine,* 544 A.2d at 690–91 (Code of Professional Responsibility constitutes some evidence of the standards required for lawyers). Furthermore, the fact is that allowing a statute of limitations to run constitutes negligence as a matter of common knowledge. Therefore, plaintiff did not have to present expert testimony on this point at all. *Hamilton v. Needham,* 519 A.2d at 174–75; *O'Neil v. Bergan,* 452 A.2d at 342; *Mills v. Cooter,* 647 A.2d 1118, 1120 (D.C.1994).

■ With respect to the second scenario (and, as it turns out, the relevant one in view of the Court's credibility findings), Mr. Gill did not rely on any particular Disciplinary Rule or other objective standard. In fact, he acknowledged that the then existing disciplinary rules did not require a writing either to limit the scope of the representation or to make a referral. Gill Tr. at 38–39. Mr. Gill's bases for his opinion were the pleadings and documents in this case, which he had reviewed, his observation of Ms. Smith's and Ms. Haden's testimony at trial, his personal experience handling legal and medical malpractice cases, his training of attorneys in his firm on the standard of care in such cases, and his teaching of standard of care in law school trial practice courses in the medical malpractice context. Gill Tr. at 6–7, 9. While *Carmichael* and *Toy* suggest that "particularized citation of normative standards" or other specific examples would have enhanced Mr. Gill's testimony, and thus have been helpful, *Doe v. Dominion Bank of Washington, N.A.,* 963 F.2d 1552, 1563 (D.C.Cir.1992), the Court is not convinced that the bases for Mr. Gill's opinion was in the least insufficient under the case law in the D.C. Circuit. *Id.* In view of this foundation, Mr. Gill's testimony about the standard of care for a client referral or limitation on the scope of a lawyer's representation sufficed to establish a standard of care by which the Court as fact-finder could evaluate Ms. Haden's conduct. *See Doe v. Dominion Bank of Washington, N.A.,* 963 F.2d at 1563.

■ Furthermore, neither *Carmichael* nor *Toy* addressed the basis required for an expert's opinion to prove standard of care in a legal malpractice case. Both *Toy* and *Carmichael* involved conduct that took place in realms unfamiliar to the fact-finders; *Toy* concerned police correctional procedures and *Carmichael* involved prison security procedures. A normative standard might be necessary in those cases and not here. "Where negligent conduct is alleged in a context which is [not] within the realm of common knowledge and everyday experience [of the fact-finder], the plaintiff is ... required to adduce expert testimony either to establish the applicable standard of care or to prove that the defendant failed to adhere to it." *Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195, 200 (D.C.1991).[3] Thus, it may be that in some circumstances a jury may not be able to evaluate an expert's opinion about unfamiliar circumstances unless the opinion is based on objective standards or concrete examples. This is a bench trial involving the conduct of a lawyer, however, and the Court is fully capable of evaluating Mr. Gill's expert testimony in view of the bases for his opinion on standard of care. The Court therefore rejects the first prong of defendant's motion to strike.

With respect to the second basis for defendant's motion to strike, the courts have taken various positions regarding the relevancy and admissibility of expert testimony as to verdict and settlement value. In *Williams v. Bashman,* 457 F.Supp. 322, 328 (E.D.Pa. 1978), the court explained that ordinarily it was appropriate to prove the probability of settlement and settlement value of the underlying case by expert testimony based on the usual outcome of similar cases. That was a non-jury case, and the parties stipulated that the court was competent to make such an expert assessment. *See also Duncan v. Lord.* 409 F.Supp. 687, 692 (E.D.Pa.1976) (court determined damages on the basis of expert testimony regarding jury verdict and settlement value). In *Fuschetti v. Bierman,* 319 A.2d 781 (N.J.Super.1974), on the other hand, the court found that expert testimony regarding settlement value was irrelevant because it was speculative whether the case would have settled and because such testimony might lead to undue consumption of time and confuse the issues for determination by the jury. *See also Tanner v. Caplin & Drysdale,* 24 F.3d 874, 878 (6th Cir.1994) (plaintiff's experts conceded that a certain settlement outcome was unlikely and that such a result would defy common sense, and ac-

---

3. "[C]ourts should not leave it to 'a jury of tailors and haberdashers to pass judgment (unaided by expert testimony) on how to make a wet and rolling deck in a seaway a safe place to work.'" *Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d at 200 (quoting *Zinn v. United States Shipping Bd. E.F. Corp.,* 10 F.2d 47, 49 (2d Cir.1925) (dissenting opinion)).

knowledged that they were incapable of determining the outcome of a trial).

■ This case, like *Williams* and *Duncan*, was tried to the Court without a jury. The Court therefore finds that, unlike the situation in *Fuschetti*, the expert testimony did not confuse the issues; it was helpful to the Court. Furthermore, the very brief testimony of Mr. Gill and the even briefer testimony of Mr. Brown have already been presented to the Court, and undue consumption of time therefore is not a consideration on this motion to strike. The determination of whether Mr. Gill's testimony is too speculative to be relevant depends on whether Mr. Gill's testimony was sufficiently well-founded to be considered helpful to the Court in determining the value of the underlying case and its settlement value. The Court is competent to make that determination even if a jury might not be. While the Court disagrees with Mr. Gill's opinion on standard of care and need not reach the issue of settlement value in view of its other findings and conclusions, the Court finds that the testimony was helpful. The Court therefore denies the motion to strike Mr. Gill's testimony.

## B. Findings of Fact

During the latter part of April 1987, plaintiff Linda Smith and her fiancee, Robert Byrd, traveled to Anchorage, Alaska, where, according to Ms. Smith, they intended to live. Ms. Smith had previously lived in Alaska while in the Air Force and while employed in a civil service position there. Ms. Smith returned to Alaska in April 1987 because she had been offered a job with the Federal Aviation Administration and had planned to start her employment within a few weeks. Ms. Smith testified that Mr. Byrd was to start his own job search in Alaska.

After arriving in Anchorage, plaintiff contacted Ms. Deloise Odom, whom she had met years earlier when she was stationed in Alaska with the Air Force, for assistance in finding a place to live. Ms. Odom and her husband, Javis Odom, owned their own home and also owned two four-unit apartment buildings. The Odoms extended the hospitality of their home for an overnight stay on the evening of April 30, 1987, and promised to lend them their pickup truck the next morning, in order to make it easier for Ms. Smith and Mr. Byrd to look at an apartment in one of the Odoms' apartment buildings and to give plaintiff and Mr. Byrd an early start in the morning in connection with Mr. Byrd's job search.

After some socializing, Ms. Smith and Ms. Odom went to their respective bedrooms to go to sleep. Mr. Byrd and Mr. Odom stayed up all night in the Odoms' family recreation room drinking liquor and, according to Mr. Odom, using cocaine. The next morning, May 1, 1987, Mr. Byrd came to the guest bedroom where he and Ms. Smith were staying. While Ms. Smith was in Mr. Byrd's arms, Mr. Odom came in and shot and killed Mr. Byrd. The same bullet that killed Mr. Odom also grazed Ms. Smith's arm, wounding her slightly. At the time of the incident, Ms. Smith was pregnant with Robert Byrd's child.[4]

There is a conflict between the testimony of Ms. Smith and Mr. Odom regarding what led up to the shooting. Ms. Smith testified that she and Mr. Byrd were in a romantic embrace at the time and that she did not know why Mr. Odom shot Mr. Byrd. Mr. Odom testified that he thought Mr. Byrd and Ms. Smith were in the midst of a serious argument and that Mr. Byrd had struck Ms. Smith. Mr. Odom said he shot Mr. Byrd in the belief that Ms. Smith's life and the life of her unborn child, as well as Mr. Odom's own life, were in danger. The incident was reported to the police and Mr. Odom was arrested, indicted and convicted of murder. Ms. Smith was an important witness both before the grand jury and at trial.

Before June 1, 1987, Ms. Smith had never before employed a lawyer for any purpose.

---

4. Plaintiff maintains that Javis Odom's act was directed against Mr. Byrd and that he did not expect or intend Linda Smith to be injured by the firing of the gun. This might be an important issue with respect to collectibility of any judgment that might have been obtained against Mr. Odom because it relates to the "intentional act" exclusion from Mr. Odom's homeowners' insurance policy about which there was much testimony. In view of the Court's findings and conclusions, however, it is unnecessary to reach this question.

Because of the incident in Alaska, however, and at the urging of family and friends, Ms. Smith called the Black Women's Lawyers Association of the District of Columbia and was referred for assistance to attorney Mabel Haden, the defendant in this case. Ms. Smith made an appointment and visited Ms. Haden's office either on May 31 or June 1, 1987, bringing with her papers she had obtained in Alaska, including newspaper accounts of the shooting incident and a pamphlet describing the Alaska Victim's Compensation Act. There is a dispute as to whether Ms. Smith met Ms. Haden on Sunday, May 31, 1987, when Robin Alexander may not have been present, or during regular business hours on Monday, June 1, 1987. The Court credits the testimony of Ms. Haden and Ms. Alexander that Ms. Alexander was present when Ms. Smith first visited Ms. Haden's office and witnessed the signing of the retainer agreement which is dated June 1, 1987.

Ms. Smith and Ms. Haden are in agreement that they entered into an attorney-client relationship during the course of the June 1 meeting and that Ms. Smith described the facts of the incident of May 1, 1987, in Alaska. They also agree that Ms. Haden undertook to file a claim on Ms. Smith's behalf with the Alaska Victim's Compensation Board. Ms. Smith acknowledges that she was the one who first mentioned the Alaska Victim's Compensation statute. They agree that the only claim that was handled by Ms. Haden for Linda Smith regarding the Alaska incident of May 1, 1987, was a claim for compensation from the Alaska Victim's Compensation Board. It is also undisputed that on or about July 26, 1988, Ms. Haden was notified that Ms. Smith had been awarded the maximum award of $40,000 available under the Alaska Victim's Compensation Act and that Ms. Haden was separately compensated for her services by the State of Alaska.

The point of dispute at the center of this case is whether Ms. Smith and Ms. Haden also discussed at their initial meeting (or at any time thereafter) Ms. Smith's desire to have Ms. Haden file a civil action on her behalf against Javis Odom in the courts of Alaska for assault and for negligent infliction of emotional distress and whether Ms. Haden undertook such representation.

The most significant exhibit in this case is the retainer agreement signed by the parties in Ms. Haden's office on June 1, 1987. It was marked and admitted at trial as Plaintiff's Exhibit No. 1 and also as Defendant's Exhibit No. 1. Ms. Haden relies on this form and the manner in which it was completed as evidence that the scope of the representation was limited to representing Ms. Smith in presenting a claim to the Alaska Victim's Compensation Board. Ms. Smith agrees that the form as completed and signed did not specifically mention filing a civil action against Javis Odom but maintains that the document did not set out the full scope of the representation, and that the document was confusing or at least ambiguous.

Ms. Smith testified that in her initial meeting with Ms. Haden she specifically told Ms. Haden that she wanted to pursue a civil action against Mr. Odom for the injury he had caused her and that Ms. Haden had agreed to take on the case. She testified that she signed a form which she thought reflected Ms. Haden's agreement to represent her both with respect to the Alaska Victim's Compensation Board and in a civil action against Mr. Odom. Ms. Smith said that she had read the form "to the best of my ability" before signing it, but said that it "was foreign to me." Ms. Smith further testified that she paid Ms. Haden $200 in cash on her first visit so that Ms. Haden would institute suit against Mr. Odom. She said that she visited Ms. Haden more than five times and that she asked Ms. Haden on several occasions about the status of the civil suit in Alaska. Ms. Haden always replied that "it was coming along," but "these things take time." Ms. Smith testified further that Ms. Haden never referred her to a lawyer in Alaska or gave her the name of Ashley Dickerson or any other Alaska attorney. Ms. Smith didn't seek out an attorney in Alaska because she "assumed" that the matter of bringing suit against Mr. Odom was "taken care of."

Mabel Haden testified that she met with Linda Smith on June 1, 1987 in her office and

that Ms. Smith told her about the incident in Alaska. Ms. Haden agreed to contact the Alaska Victim's Compensation Board and seek compensation under the Victim's Compensation Act for Ms. Smith. She said that she undertook no additional obligations on Ms. Smith's behalf. Ms. Haden testified that both she and Ms. Smith signed a form agreement setting forth the scope of her representation of Ms. Smith and that the agreement was witnessed by Robin Alexander, her secretary and assistant.

According to Ms. Haden and her long-time assistant, Robin Alexander, the agreement, entitled "AGREEMENT (Contingent Fee)," is a pre-printed form that is used for most contingent fee matters taken on by Ms. Haden. Ms. Alexander testified that she had previously amended the form by typing in the words "I shall also pay for cost of depositions, transcripts, and additional court filing fees as they arise during the course of litigation," and that this standard form, as amended by typing in this additional language, was photocopied and used for many of the matters handled by Ms. Haden. The form had blank spaces for the addition of the name of the client, the name of the person or entity against whom suit was to be brought and the nature of the damages sustained. It also had a blank space for Ms. Haden or Ms. Alexander to insert the contingent fee in the form of a percentage of the amount recovered in the event of settlement or trial that would constitute Ms. Haden's payment for professional services.

In the portion of the pre-printed form agreement reflecting the scope of the representation, Ms. Haden pointed out that it stated only that she would represent Ms. Smith "against the State of Alaska, Division of Violent Crimes Compensation Board, for damages sustained by reason of violent death of Robert M. Byrd on May 1, 1987," and that it nowhere mentioned Javis Odom. She testified that if she had agreed to represent Ms. Smith in a suit against Mr. Odom it would have been her practice to complete the form agreement to state that she undertook to sue Javis Odom for damages. In the portion of the form setting forth the consideration Ms. Haden was to receive for her services, the words "Payment, Alaska's Treasury" were typed. Ms. Haden testified that in the normal contingent fee case, this portion of the form would indicate the percentage of the amount recovered that was intended for counsel. In her testimony, Ms. Haden contrasted the way in which this portion of this agreement was completed with another agreement in which different percentages were indicated depending upon whether recovery occurred as a result of settlement or after suit.

As noted, the form agreement signed by Ms. Haden and Ms. Smith also contained the typed in language "I shall also pay for cost of depositions, transcripts and additional court filing fees as they arise during the course of litigation," but that language had been crossed out. Ms. Haden testified that this language, added to the pre-printed form agreement by her assistant for use in normal contingent fee cases, was crossed out in this case because, unlike the normal civil lawsuit, there would be no depositions, transcripts or additional court filing fees in connection with the claim made to the Alaska Victim's Compensation Board. Elsewhere on the form, the language "Civil action not necessary" was typed in. A portion of this language was also crossed out, and Ms. Haden could not explain why. She testified that those words were typed in at the time of her meeting with Ms. Smith to reflect Ms. Haden's view that a civil action was not necessary in connection with her pursuit of Ms. Smith's administrative claim before the Alaska Victim's Compensation Board.

Ms. Haden's testimony was corroborated by the testimony of Robin Alexander, Ms. Haden's secretary and assistant. Ms. Alexander testified that when Ms. Smith came to Ms. Haden's office, Ms. Smith told Ms. Alexander that she wanted help with the Alaska Victim's Compensation Board and did not say that she wanted Ms. Haden to file a civil action against Mr. Odom. Ms. Alexander testified that she typed in the phrase "Payment, Alaska's Treasury" in the space where normally she would type in the percentage Ms. Haden would receive as a contingent fee in order to show that Ms. Haden would be paid separately by the Alaska Victim's Com-

pensation Board for her work in pursuing the claim and not from the amount recovered for Ms. Smith. She also testified that the form language respecting the costs of deposition, transcripts and court filing fees was crossed out because Ms. Haden was not going to file a civil action on behalf of Ms. Smith. As for the language "Civil action not necessary," Ms. Alexander testified that she added these words because Ms. Haden was not going to file a civil suit because she was proceeding administratively before the Board and did not need to pursue a civil action in connection with the administrative claim. Ms. Alexander testified that it was a mistake to have lined out those words, or a portion of those words, and said she must have done so inadvertently while lining out the language regarding depositions, transcripts and court filing costs.

 On the basis of this evidence, the Court finds that the scope of Ms. Haden's employment by Ms. Smith was limited to presenting an administrative claim on Ms. Smith's behalf to the Alaska Victim's Compensation Board. The testimony of Ms. Haden and Ms. Alexander is credible and is corroborated by Plaintiff's and Defendant's Exhibit No. 1. In addition, the Court gives credence to the testimony of Robin Alexander that she crossed out the words on the form agreement "I shall also pay for cost of depositions, transcripts and additional court filing fees as they arise during the course of litigation" because such fees would not have accrued in connection with the claim before the Alaska Victim's Compensation Board. The Court also gives credence to the testimony of Ms. Alexander that she typed in the words "Civil action not necessary" and crossed out a portion of those words by mistake. The Court finds that the plaintiff never sought to expand Ms. Haden's scope of responsibility beyond the filing of the claim before the Alaska Victim's Compensation Board and gives credence to the testimony of Ms. Haden and Robin Alexander, both of whom stated that plaintiff never asked Ms. Haden to file such a lawsuit. While it is possible that Ms. Smith misunderstood what was said to her and what was provided to her in writing, the Court finds that Ms. Haden provided a sufficiently clear explanation of

the scope of her representation and that plaintiff has not established otherwise by a preponderance of the evidence.

Testimony regarding the referral by Ms. Haden of Ms. Smith to a lawyer in Alaska lends further credence to the defendant's position and further undermines plaintiff's credibility. Ms. Haden testified that when Linda Smith asked about bringing a civil lawsuit in Alaska against Mr. Odom, Ms. Haden told Ms. Smith that she "might have a case" but that she (Ms. Haden) had never been to Alaska and didn't handle cases in other states. She did promise, however, to refer Ms. Smith to a good friend of hers who was a lawyer in Alaska. She testified further that she gave Linda Smith the name (and perhaps the phone number) of her friend Ashley Dickerson and encouraged her to call Ms. Dickerson. According to Ms. Haden, Ms. Smith subsequently told Ms. Haden that she had called Ms. Dickerson when she was in Alaska to testify in the criminal case. Robin Alexander corroborated Ms. Haden's testimony in this regard. She testified that she was present when Ms. Haden called Ms. Dickerson in Alaska and that she heard Ms. Haden tell Ms. Dickerson over the telephone that she was going to have Linda Smith contact her when she next went to Alaska. Ms. Smith denies that any of this took place and says that there was no referral or even a suggestion that she call Ms. Dickerson.

The Court finds particularly compelling the testimony of Ms. Dickerson herself that Ms. Haden told her on the telephone about a client of Ms. Haden's who might be calling for assistance. Ms. Dickerson testified that Ms. Haden "gave me some idea as to what had happened and that the client would call me" and asked "if I would talk with this girl when she called and when the girl called I did." Dickerson Tr. at 10, 12. Ms. Dickerson said that she received a telephone call from Ms. Smith within ten days after Ms. Haden told her that Ms. Smith would be calling her, "and when the call came, the girl identified herself and I had no trouble connecting it with the call that I was expecting." Dickerson Tr. at 12. Ms. Dickerson said that Ms. Smith identified herself over the telephone and said that Ms. Haden had told her

to call. She further testified that Ms. Smith described the shooting incident, about which Ms. Dickerson had read in the Alaska newspapers, and that they discussed Mr. Odom's assets or lack of assets over the telephone. Ms. Dickerson told Ms. Smith during the call that she thought she had a claim for damages. Dickerson Tr. at 14, 16. Ms. Dickerson said that she discussed the Alaska Victim's Compensation Act with Ms. Smith in this telephone call because, based on what Ms. Smith had told her, she was concerned that Mr. Odom might not have any money and that it might be easier to obtain compensation from the State. Dickerson Tr. at 13.

According to Ms. Dickerson, at the conclusion of the conversation Ms. Smith "said that she would call me for an appointment at a later date." Ms. Dickerson testified that Ms. Smith did call back and made an appointment for a time soon thereafter but that she never appeared for the appointment; Ms. Dickerson waited for Ms. Smith's next call but it never came. Dickerson Tr. at 18. Ms. Dickerson further testified that when she next saw Ms. Haden at a bar association meeting Ms. Haden asked whether Ms. Smith had ever contacted Ms. Dickerson and Ms. Dickerson reported that Ms. Smith had made an appointment but did not keep it. Dickerson Tr. at 18.

On May 25, 1988, Ms. Dickerson wrote a letter to Ms. Haden about a variety of personal and professional matters. In the course of the letter, she wrote:

> I regret that I did not get the chance to talk further with your client who had indicated a desire to bring a civil suit against a man who was convicted of shooting her boyfriend. She is also eligible for "victims of violence" benefits under our law in my opinion. Please let me know how she is getting along and if there is anything I can do for her on this end.

Defendant's Exhibit 54. Then, on October 30, 1991, presumably at Ms. Haden's request in connection with this threatened lawsuit, Ms. Dickerson wrote another letter to Ms. Haden which stated:

> I recall vividly a certain murder trial in Anchorage during 1987 in which a man from your area had been the victim. I recall a telephone call in which you advised me of a young lady being involved who was interested in getting her rights as a victim in that murder protected as well as the rights of her child.
>
> I recall one telephone call from a lady stating she was the person whom you had referred. The lady stated that she was injured, but would let me know later if she needed me. The lady never called back.

Defendant's Exhibit 10.

The Court rejects plaintiff's argument that Ms. Dickerson's testimony is "internally inconsistent and incredible," as well as plaintiff's arguments based on partial telephone records from Ms. Haden's office showing some but not all of her calls to Alaska. The Court finds Ms. Dickerson's testimony totally credible. Ms. Dickerson had no reason to lie under oath or to state as facts events that never occurred. The Court finds that her friendship with Ms. Haden is an insufficient basis on which to conclude that she was biased or that she would perjure herself or create false evidence. On the issue of whether Ms. Haden referred Ms. Smith to an Alaska lawyer, the Court therefore finds that the testimony of Ms. Haden, Ms. Alexander and Ms. Dickerson are credible and that they, rather than Ms. Smith, are to be believed. Ms. Haden limited her representation of Ms. Smith to filing an administrative claim before the Alaska Victim's Compensation Board and referred Ms. Smith to Ms. Dickerson with respect to the possibility of filing a civil lawsuit in the courts of Alaska.

Because the Court credits Ms. Haden's, rather than Ms. Smith's, testimony, the Court need only consider the testimony of the experts as it relates to Mr. Gill's second scenario. The question is whether Ms. Haden breached the applicable standard of care by failing to adequately define the limited scope of her representation, by failing to properly refer Ms. Smith to another attorney to handle Ms. Smith's claim against Mr. Odom in Alaska, and by failing to communicate clearly with Ms. Smith that the representation was limited. In that regard, the Court finds that the applicable standard of care is that stated by defendant's expert,

Edwin C. Brown, Jr., rather than that stated by plaintiff's expert, John G. Gill, Jr.

Mr. Brown testified that at the time Ms. Smith retained Ms. Haden to represent her there was no requirement in the Code of Professional Responsibility or the Disciplinary Rules then in effect in the District of Columbia that a retainer agreement be in writing; Mr. Gill agreed with that statement. Gill Tr. at 38. Where Mr. Brown and Mr. Gill parted company was with respect to the clarity of the written retainer agreement that was in fact entered into in this case. Mr. Gill found Exhibit No. 1 confusing (Gill Tr. at 9, 12–13), while Mr. Brown found nothing in the exhibit that was confusing or ambiguous, concluding that it clearly did not obligate Ms. Haden to undertake a civil claim against Mr. Odom. In Mr. Brown's opinion, the language "Civil action not necessary," that had been typed in, meant that no civil suit was involved in view of the nature of the representation undertaken, which was to file a claim with the Alaska Victim's Compensation Board.

█ The Court finds that a written retainer agreement was not necessary but that the agreement that was signed did not obligate Ms. Haden to represent Ms. Smith in bringing a civil suit against Mr. Odom in Alaska. While the lining out of the words "Civil action not necessary" may have been a mistake resulting in some confusion in Ms. Smith's mind, the form was otherwise clear that Ms. Haden's representation of Ms. Smith was limited to representing her before the Alaska Victim's Compensation Board.

With respect to the question whether the referral to Ashley Dickerson had to be in writing, Mr. Gill testified that he thought it was the better practice and a violation of the applicable standard of care not to put a referral of a matter to another attorney in writing. Gill Tr. at 13–14, 38–39. Mr. Brown, on the other hand, testified that it was sufficient, and within the applicable standard of care, when making a referral to simply furnish the client with the name of the lawyer to whom one was referring the client and the phone number of that lawyer, if available. He said it was customary to suggest three names of lawyers but that it was not essential to do so. He testified that in his opinion Ms. Haden did not violate the applicable standard of care by orally explaining that Ms. Smith might have a civil action in Alaska, orally advising her of the applicable statute of limitations, and making the referral to Ms. Dickerson orally rather than in writing. Further, it was Mr. Brown's opinion that, once having provided Ms. Smith with the name of an Alaska attorney, Ms. Haden had no continuing obligation to ask Ms. Smith whether she had in fact retained that or any other Alaska attorney and no obligation to otherwise follow up after making a referral.

█ Mr. Brown based his opinion not only on his own experience but also on conversations he had with lawyers at the Legal Aid Society, with staff lawyers at the Ethics Committee of the District of Columbia Bar, with staff at the Bar's Lawyer Referral and Information Service, and with prominent and experienced private practitioners. While not independently evidence of the standard of care for a client referral, this testimony supports the conclusion that Mr. Brown's opinion is worthy of belief. The Court finds that Mr. Brown's opinion as to the applicable standard of care for a referral is the correct one and that as a matter of fact and legal ethics there is no violation of the applicable standard of care when a lawyer refers a client to another lawyer orally rather than in writing.

█ Because the Court finds that Ms. Haden's agreement to represent Ms. Smith was limited in scope, that she obtained the maximum compensation available under the Alaska Victim's Compensation Act, that she did not undertake to file a civil suit against Mr. Odom on behalf of Ms. Smith and that her referral of Ms. Smith to Ms. Dickerson was done in a proper fashion, the Court finds that Ms. Haden did not violate the applicable standard of care and did not commit legal malpractice by failing to file a civil action against Mr. Odom in Alaska. The Court therefore need not consider the nature and extent of the physical and mental injuries suffered by plaintiff as a result of the shooting incident, whether she would have ob-

tained a judgment against Mr. Odom in Alaska if suit had been timely filed, or whether Mr. Odom's assets, including his homeowners' insurance policy, would have been available to satisfy any such judgment.[5]

### C. Conclusions Of Law

1. In a legal malpractice case in the District of Columbia the plaintiff bears the burden of presenting evidence establishing that the parties entered into an attorney-client relationship, what the applicable standard of care is, that the standard of care has been violated by the defendant-lawyer, and that there was a causal relationship, or proximate cause, between the violation and the harm complained of—in this case, the loss of a judgment in some sum against Mr. Odom. *See Battle v. Thornton,* 646 A.2d 315, 318 (D.C.1994), *citing O'Neil v. Bergan,* 452 A.2d 337, 341 (D.C.1982); *Morrison v. MacNamara,* 407 A.2d 555, 560 (D.C.1979). To show that the negligence was the proximate cause of the injury, plaintiff must show that she had a good cause of action against the party she wished to sue; otherwise, the plaintiff "loses nothing by the conduct of his attorney even though the latter was guilty of gross negligence." *Niosi v. Aiello,* 69 A.2d 57, 60 (D.C.1949).

2. Ms. Smith had a cause of action against Mr. Odom in the courts of Alaska for his negligent infliction of emotional distress on her as a result of his actions on or about May 1, 1987.

3. Under Alaska law, the statute of limitations on the cause of action which Linda Smith had against Javis Odom required suit

to be filed within two years after the cause of action accrued. Because no such suit was filed within the applicable period, it now is time-barred.

4. The only claim that was handled by Mabel Haden for Linda Smith regarding the Alaska incident on May 1, 1987 was a claim for compensation from the Alaska Victim's Compensation Board. On or about July 26, 1988, Ms. Smith was awarded the maximum award of $40,000 available under the Alaska Victim's Compensation Act.

5. Plaintiff failed to prove by a preponderance of the evidence that the defendant breached the duty owed to her under the attorney-client relationship evidenced by Plaintiff's and Defendant's Exhibit No. 1. That document limited the scope of the representation to a claim for compensation from the Alaska Victim's Compensation Board.

6. Plaintiff's testimony was insufficient to demonstrate by a preponderance of the evidence a breach of the duty of care in view of the more compelling and credible testimony of other witnesses, the limited scope of that representation evidenced by Plaintiff's and Defendant's Exhibit No. 1, and the fact that plaintiff was awarded the maximum award under the Alaska Victim's Compensation Act.

7. Plaintiff also failed to prove by a preponderance of the evidence that the scope of the attorney-client relationship between Mabel Haden and Linda Smith extended to filing a civil lawsuit against Javis Odom in the State of Alaska. There is no credible testimony and no documents to support plaintiff's

**5.** The Court notes, however, that Dr. Thomas Carl Goldman, plaintiff's expert psychiatrist, and Dr. Neil Blumberg, defendant's expert psychiatrist, are in agreement that Ms. Smith did suffer post-traumatic stress disorder as a result of the May 1987 shooting incident in Alaska. They disagree as to the length of time she suffered from the injury and whether there was a supervening or intervening cause for the injuries of which she now complains. For reasons that need not be elaborated here, the Court agrees with Dr. Blumberg, rather than with Dr. Goldman, that a March 1989 abortion, that apparently was negligently performed and was life threatening and extremely traumatic, was a supervening or intervening cause of post-traumatic stress disorder.

Similarly, the Court need not reach the question of whether, even if judgment had been entered in her favor in Alaska, plaintiff could have recovered from Javis Odom's assets and from his homeowners' insurance policy. It therefore is unnecessary to discuss the value of the rental properties owned by Mr. and Ms. Odom or to evaluate the evidence introduced with respect to their sale and foreclosure. Nor is it necessary to consider the testimony of Paul Zimmerman and John Paul Wilson and the computer print-outs, insurance policies and riders introduced in evidence through their testimony as it relates to Mr. Odom's State Farm Insurance Company homeowners' policy, the extent of coverage and the "intentional act" exclusion.

contention that Ms. Haden agreed to file such a lawsuit.

8. Requisite care by an attorney is that care which a reasonably prudent attorney would have exercised under the same or similar circumstances. *Morrison v. MacNamara*, 407 A.2d 555, 560 (1979).

9. "[W]hen faced with conflicting expert testimony, the trial court may credit one expert over the other or even disregard both in rendering its judgment." *Rock Creek Plaza Woodner Limited Partnership v. District of Columbia*, 466 A.2d 857, 859 (D.C.1983). The Court credits the testimony of Defendant's legal expert Edwin Brown that a reasonably prudent attorney exercising the applicable standard of care under the same or similar circumstances would not necessarily have put a client referral to another attorney in writing. Ms. Haden's conduct was reasonable and in compliance with the applicable standard of care when she orally referred Ms. Smith to Ashley Dickerson.

10. Defendant had no duty to pursue a civil claim against Mr. Odom on Ms. Smith's behalf or to monitor whether a civil action had been instituted. Ms. Haden's explanation regarding the statute of limitations and the need to seek professional legal help in the State of Alaska was sufficiently clear, and no writing was required to refer Ms. Smith to Ms. Dickerson. There was no breach of the standard of care by the defendant in this case.

11. The statute of limitations ran on Ms. Smith's claim against Mr. Odom as a result of Ms. Smith's failure to contact Ashley Dickerson or some other Alaska attorney to pursue the claim on her behalf.

12. Collectibility is not a specific element of a legal malpractice claim in the District of Columbia. Placing the burden on a plaintiff to prove collectibility would be unfairly burdensome, particularly when a legal malpractice suit is often brought years after the underlying events and when the delay by the plaintiff in bringing such a suit is because of the defendant-lawyer's failure to act in a timely manner in the first place. The fairer approach is to wait until after malpractice has been proven and then to impose on the negligent attorney the burden of going forward with evidence to show that the damages imposed could not in fact have been recovered from the wrongdoer in the original case. *Jenkins v. St. Paul Fire & Marine Ins. Co.*, 422 So.2d 1109, 1110 (La. 1982); *cf. Winter v. Brown*, 365 A.2d 381, 385 (D.C.1976). Uncollectibility of a judgment is "a matter constituting an avoidance or mitigation of the consequences of one's negligent act," rather than as a matter of required proof for the one asserting the negligence. *Jourdain v. Dineen*, 527 A.2d 1304, 1306 (Me.1987). Uncollectibility is an affirmative defense that must be pleaded and proved by the defendant. *Jourdain v. Dineen*, 527 A.2d at 1306; *see Hoppe v. Ranzini*, 158 N.J.Super. 158, 385 A.2d 913, 920 (App.Div. 1978).

On the basis of the foregoing Findings of Fact and Conclusions of Law, the Court enters judgment in favor of the defendant and dismisses all claims against the defendant.

An accompanying Order consistent with this Opinion, Findings Of Fact And Conclusions Of Law has been filed this same day entering judgment for defendant.

### ORDER

This case was tried to the Court without a jury on October 17, 18, 26 and 27, 1994. For the reasons stated in the Opinion, Findings of Fact and Conclusions of Law filed on the same day as this Order, it is this 23rd day of December, 1994, hereby

ORDERED that Defendant's motion to dismiss is DENIED under Rule 52(c), Fed. R.Civ.P.; it is

FURTHER ORDERED that Defendant's motion to strike expert testimony is DENIED; it is

FURTHER ORDERED that judgment is entered for Defendant after trial; and it is

FURTHER ORDERED that this case is dismissed from the docket of the Court.